UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
STEVEN HIRTH,                                     :

                          Plaintiff,     :         OPINION AND ORDER
                                                   15 Civ. 3245 (GWG)
     -against-                           :

THE AMERICAN INSURANCE COMPANY,          :

                                         :

                          Defendant.
--------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff Steven Hirth filed this action for breach of a homeowners insurance policy

issued by defendant The American Insurance Company ("AIC"). Before the Court is AIC's

motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons

that follow, AIC's motion is denied.

I. FACTUAL BACKGROUND

       On this motion to dismiss, we assume the truth of all allegations in the complaint.

Ashcroft v. Iqbal, 556 U.S. 662, 677-79 (2009). In addition, we consider the complete text of

 the insurance policy because the complaint "relies heavily upon its terms and effect, which

_____

       [1] See Notice of Motion, filed July 21, 2015 (Docket # 14); Declaration of Michael P.
Welch, filed July 21, 2015 (Docket # 15) ("Welch Decl."); Affidavit of Timothy Kaczorek, filed
July 21, 2015 (Docket # 16) ("Kaczorek Aff."); Defendant The American Insurance Company's
Memorandum of Law in Support of its Motion to Dismiss, filed July 21, 2015 (Docket # 17)
("D. Mem."); Affirmation of James J. Mahon, filed Aug. 18, 2015 (Docket # 18); Memorandum
of Law in Opposition to Defendant's Motion to Dismiss, filed Aug. 18, 2015 (Docket # 19) ("P.
Mem."); Defendant The American Insurance Company's Reply Memorandum of Law in Support
of its Motion to Dismiss, filed Sept. 3, 2015 (Docket # 20) ("D. Repl. Mem."); Declaration of
Michael A. Troisi, filed Sept. 3, 2015 (Docket # 21); Letter from Michael P. Welch, filed Dec.
11, 2015 (Docket # 23) ("First D. Ltr."); Letter from James Mahon, filed Dec. 11, 2015 (Docket
# 24) ("First P. Ltr."); Letter from Michael P. Welch, filed Dec. 18, 2015 (Docket # 25)
("Second D. Ltr."); Letter from James Mahon, filed Dec. 18, 2015 (Docket # 26) ("Second P.
Ltr."). The plaintiff's letter of Dec. 11, 2015 (Docket # 23), was missing a line of text when it
was first filed. A complete version of the letter was filed as an attachment to Docket # 27.

renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d

147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62

F.3d 69, 72 (2d Cir. 1995)).

Hirth had an insurance policy with AIC that covered his apartment at 200 Central Park

South, Apartment 28B, as well as certain valuables listed in the policy.  See Policy Number

NZH0228654, appended as Exhibit 1 to Kaczorek Aff. ("Policy") at 11.[2]  It was effective from

June 23, 2012 to June 23, 2013.  See id. at 10.

On August 12, 2012, Hirth's apartment suffered water damage from another apartment so

severe that Hirth and his family were forced to evacuate and arrange for lodging elsewhere.

Verified Complaint, appended as Exhibit A to Notice of Removal, filed April 24, 2015 (Docket

# 1) ("Compl.") ¶ 5.  Hirth reported the loss to AIC on August 12, 2012, and over the course of

the following months, AIC paid him $208,108.63 for damage to the apartment and certain

contents covered by the policy, including artwork.  Id. ¶ 6.

The policy contained a clause that covered living expenses.  The clause stated:

1. Loss of Use of the Residence Premises

a.      If a loss covered by an occurrence under this policy makes that
        part of the residence premises where you reside not fit to live in,
        we will pay:

        Additional Living Expense, meaning any necessary increase in
        living expenses incurred by you so that your household can
        maintain its normal standard of living while you live elsewhere.

Policy at 34 (bold text omitted).  AIC paid Hirth $10,725.38 to compensate him for his stay at a

hotel from August 26 through September 1, 2012.  Compl. ¶ 7.  In addition, AIC offered to pay

---

[2] The Policy consists of documents that are separately paginated.  Our citations are to the
page number provided by the ECF system (ECF Docket # 16-1).

the cost of accommodations for Hirth and his family at a comparable hotel in New York City for an additional four months, which was AIC's estimate of the time that it would take to repair the damage to the apartment.  Id.  Hirth alleges that the cost of a hotel would have been more than $40,000 per month.  Id. ¶ 8.  Hirth did not accept AIC's offer and instead entered into a short-term sublease for a different apartment at 200 Central Park South, Apartment 6E, at a rental rate of $22,500 per month.  Id. ¶ 9.

Hirth sought payment from AIC to cover the additional living expenses for the time that he and his family could not live in Apartment 28B.  Id.  The repairs to Apartment 28B took almost two years, and the apartment could not be occupied until July 1, 2014.  Id. ¶ 10.

Throughout 2013 and 2014, Hirth, AIC, and their attorneys discussed Hirth's claim for payment of the rent at Apartment 6E.  Id. ¶ 11.  Hirth declined to provide certain documents sought by AIC without a confidentiality agreement.  Id. ¶ 12.  On February 2, 2015, AIC denied Hirth's claim for the additional living expenses.  Id. ¶ 13.

Hirth filed the instant suit in New York state court about three weeks later, on February 24, 2015.  See id. at 1.  AIC removed the case to this Court.  See Notice of Removal, filed April 24, 2015 (Docket # 1).  The complaint seeks damages of "not less than $495,000" plus interest, Compl. ¶ 15, apparently based on the living expenses Hirth incurred for subleasing Apartment 6E at 200 Central Park South.

## II.  THE LIMITATION PROVISION IN THE POLICY

The policy contains a section entitled "Policy Conditions."  Policy at 52.  Included in that section is a subsection called "Property Conditions."  Id. at 55.  One of these "Property Conditions" states as follows:

Suit Against Us - No action can be brought unless the policy provisions have been

3

fully complied with and the action is started within two years after the **occurrence**.

Id. at 57 (bold text in original).

In the section of the policy entitled "Prestige Home Premier," id. at 12, 28, the policy defines "occurrence" as "accidental loss and damage to covered property which occurs during the policy period and is caused by one or more causes of loss we cover." Id. at 31 (the "PHP Definition").[3]  "Occurrence" is also defined in the portion of the policy offering coverage over certain limits, entitled "Prestige Excess" (the "PE Definition").  See id. at 12, 60-61, 64.  In this portion of the policy, "occurrence" is defined as "accidental loss of or damage to, including continuous or repeated exposure to the same or similar harmful conditions, that first results, during the policy period, in bodily injury or property damage . . . ."  Id. at 67.

## II.  GOVERNING LAW

### A.  Motions to Dismiss

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted."  A court may consider a statute of limitations defense on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  See, e.g., Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 425-26 (2d Cir. 2008).  The defendant has the burden of proof on a statute of limitations defense in New York.  Bano v. Union Carbide Corp., 361 F.3d 696, 710 (2d Cir. 2004).[4]

---

[3] This definition applies to "Coverage For Damage To Your Property."  Id.  A separate definition, not relevant here, is given with respect to "Coverage For Liability And Medical Payments To Others."  Id.

[4] While neither party has briefed the issue of choice-of-law, both sides cite to New York law and thus we assume that New York law applies.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and

B. <u>Interpreting Insurance Policies</u>

The Second Circuit has described New York law governing the interpretation of

insurance policies as follows:

> Under New York law, insurance policies are interpreted according to general
> rules of contract interpretation. . . . [C]ontract terms are ambiguous if they are
> "capable of more than one meaning when viewed objectively by a reasonably
> intelligent person who has examined the context of the entire integrated
> agreement and who is cognizant of the customs, practices, usages and
> terminology as generally understood in the particular trade or business." <u>Nowak</u>
> <u>v. Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1192 (2d Cir. 1996) (citation
> omitted). If a court concludes a provision in an insurance contract is ambiguous,
> it may consider extrinsic evidence to ascertain the parties' intent at the formation
> of the contract. <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 397 (2d Cir. 2009).
> If the extrinsic evidence fails to establish the parties' intent, courts may apply
> other rules of contract interpretation, including New York's rule of <u>contra</u>
> <u>proferentem</u>, according to which ambiguity should be resolved in favor of the
> insured. <u>See</u> <u>Haber v. St. Paul Guardian Ins. Co.</u>, 137 F.3d 691, 697–98 (2d Cir.
> 1998). Ambiguity is absent where the contract's language provides "a definite and
> precise meaning, unattended by danger of misconception in the purport of the
> contract itself, and concerning which there is no reasonable basis for a difference
> of opinion." <u>Hunt Ltd. v. Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d
> Cir. 1989) (internal quotation marks and alteration omitted). "Language whose
> meaning is otherwise plain does not become ambiguous merely because the
> parties urge different interpretations in the litigation." <u>Id.</u> An unambiguous
> provision of the contract should be given its "plain and ordinary meaning" and the
> contract should be construed without reference to extrinsic evidence. <u>Alexander</u>
> <u>& Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London</u>, 136
> F.3d 82, 86 (2d Cir. 1998).

<u>Olin Corp. v. Am. Home Assur. Co.</u>, 704 F.3d 89, 98-99 (2d Cir. 2012).

A court will find language in an insurance contract ambiguous if "reasonable minds

could differ as to its meaning." <u>Haber</u>, 137 F.3d at 695 (citation omitted). In reviewing the two

interpretations, a court "need not determine which is the more likely interpretation; we need

merely decide whether [each] . . . is sufficiently reasonable to render the clause ambiguous."

---

such implied consent is sufficient to establish choice of law.") (citation and internal punctuation
omitted).

Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115 (2d Cir. 1994) (internal quotations and citations omitted).  Contracts should be read as a whole to determine whether an ambiguity exists.  Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 300 (2d Cir. 1996); accord W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 162 (1990).

Under New York law, a breach of contract action must typically be brought within six years of the accrual of the cause of action.  N.Y. C.P.L.R. § 213(2).  A cause of action for breach of contract accrues "once the conditions precedent to filing suit have been satisfied." Fabozzi v. Lexington Ins. Co., 601 F.3d 88, 93 (2d Cir. 2010) (citation omitted).  Parties may agree to shorter limitations periods in writing.  Smile Train, Inc. v. Ferris Consulting Corp., 117 A.D.3d 629, 630 (1st Dep't 2014) (quoting John J. Kassner & Co. v. City of New York, 46 N.Y.2d 544, 551 (1979)).  Insurance policies may include such agreements.  See, e.g., Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966 (1988); Blitman Constr. Corp. v. Ins. Co. of N. Am., 66 N.Y.2d 820 (1985)).

New York has an extensive body of case law discussing language that is effective in setting a limitations period in an insurance policy.  As was explained by the Second Circuit in Fabozzi, New York case law makes clear that "generic language setting a contractual limitations period should be interpreted to start the clock not at the time of the accident itself but only once the right to bring an action exists — that is, once all conditions precedent have been met."  601 F.3d at 91 (citation and internal quotation marks omitted).  Policies stating that the limitations period begins with "the inception of the loss" are sufficiently specific to avoid the usual rule regarding "generic" language.  Id. (citations omitted).  In a demonstration of the narrowness of the New York rule regarding limitation provisions, Fabozzi held that a policy provision requiring suit within "two years after the date of loss" constituted "generic" language that ran the clock

6

only from the time the right to bring an action existed, not from the date of the underlying

incident that gave rise to the loss.  Id. at 90-91.

III.  DISCUSSION

    A.    Which Definition of "Occurrence" Applies

The policy's suit limitation provision reads, "[n]o suit can be brought [against AIC]

unless the policy provisions have been fully complied with and the action is started within two

years after the **occurrence**." Policy at 57 (bold text in original).  As noted above, there are two

different definitions of the term "occurrence": one in the Prestige Home Premier policy, and

another in the Prestige Excess policy.

AIC argues that only the PHP Definition — the definition that relates to "Coverage For

Damage To Your Property" — applies to this case because Hirth's claim is a first-party liability

claim; that is, the claim relates to AIC's obligation to Hirth.  First D. Ltr. at 1-2.  The PE

Definition, by contrast, appears in the part of the policy addressing excess liability coverage,

which covers only Hirth's liability to others, that is, "third-party liability."  Id. at 2.  Hirth has

not claimed recovery under the PE portion of the policy.  Second D. Ltr. at 1-2.  Thus, AIC

argues that the plaintiff was "on notice that [the policy] contained separate definitions of

occurrence applicable to separate events and coverages under the policy." Second D. Ltr. at 1,

n.1 (citation omitted) (referring to Policy at 31).

Hirth argues that because the PE and PHP portions are part of a single "policy" and have

the same policy number, they should be interpreted together.  First P. Ltr. at 2-3.  Hirth urges

that the PE Definition should therefore be read "as restating and clarifying the meaning of the

[PHP Definition]."  Id. at 3.  Hirth argues that AIC's first-party versus third-party liability

interpretation is "wholly unsupported by contractual language" because the suit limitation

provision itself does not specify which definition it relies on, nor do the Prestige Home Premier or Prestige Excess portions limit the use of their respective definitions.  Second P. Ltr. at 2. Hirth also argues that the mere presence of multiple definitions "is strong circumstantial evidence" that the policy is ambiguous.  First P. Ltr. at 5.

We disagree.  The insurance policy consists of a homeowners insurance policy, the Prestige Home Premier policy, Policy at 28-59, and an "excess" insurance policy, the Prestige Excess policy, Policy at 60-84.  The limitation provision is contained only in the Prestige Home Premier policy.  Policy at 57.  Each policy has its own definitions, which are set forth clearly and separately.  The definitions section of the Prestige Home Premier policy, Policy at 28-32, displays the words "Prestige Home Premier" prominently and in large letters at the beginning of the section, id. at 28.  Thus, there is no question that the definitions in that section apply to the Prestige Home Premier policy.  Similarly, the definitions section of the Prestige Excess Policy, id. at 64-68, displays the words "Prestige Excess" prominently and in large letters at the beginning of the section, id. at 64.  Thus, it is equally apparent the definitions in that section apply to the Prestige Excess policy.  We reject Hirth's proposal to read the two provisions as negating each other inasmuch as the policy must be read in a way that gives meaning to every part of the contract.  See, e.g., Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008); accord W.W.W. Assocs., Inc., 77 N.Y.2d at 162.  Reading the policy documents as a whole, it is clear that the homeowners policy is the only one that covers claims for additional living expenses.

There is nothing unclear about the application of the definitions in each portion of the policy.  Thus, no ambiguity is created by the fact that the policy has two separate definitions of "occurrence."  See generally Blanar v. State Farm Ins. Cos., 34 A.D.3d 1333 (4th Dep't 2006)

8

(no ambiguity in policy that had one limitation period for first-party coverage and a different limitation period for third-party coverage).[5]

      B.  <u>Whether the Limitations Provision Is Unambiguous</u>

We turn to the issue of whether the language of the limitations provision, including the incorporated PHP Definition of "occurrence," is unambiguous in applying to Hirth's claim in this case. We begin by combining the suit limitation provision with the PHP Definition of "occurrence." The combined sentence reads:

> No suit can be brought [against AIC] unless the policy provisions have been fully complied with and the action is started within two years after the . . . accidental loss and damage to covered property which occurs during the policy period and is caused by one or more causes of loss we cover.

<u>See</u> Policy at 31, 57. AIC argues that the term "accidental loss and damage to covered property" refers to the date of the incident that gave rise to the coverage — in this case, the water damage. D. Mem. at 3-4; D. Repl. Mem. at 2. In AIC's view, any suit under the policy filed more than two years after the date of the incident giving rise to coverage is necessarily time-barred. D.

---

[5] Hirth makes other arguments regarding the two definitions based on AIC's having mistakenly relied on the PE Definition of "occurrence" in some of its motion papers. <u>See</u>, <u>e.g.</u>, D. Mem. at 3 (quoting PHP Definition but citing to PE Definition); D. Repl. Mem. at 2 (referring to PHP Definition but citing to PE Definition). AIC states that this was an "inadvertent error." First D. Ltr. at 1. Hirth argues that by citing the PE Definition, AIC "judicially admitted that it applies here." First P. Ltr. at 4. The case cited by Hirth, however, <u>Purgess v. Sharrock</u>, 33 F.3d 134, 144 (2d Cir. 1994), involved the admissibility in evidence of a factual statement by an attorney regarding an event relevant to the case. Here, AIC made no statement regarding any event or other factual matter. The question of which of the two definitions applies is not a factual question but a question of legal interpretation. Thus, <u>Purgess</u> has no relevance. We also reject plaintiff's related argument that counsel's error shows there is an ambiguity in the policy. Counsel's conduct is irrelevant to the question of contractual interpretation. Either the policy language is ambiguous or it is not. <u>See generally</u> <u>Hunt Ltd.</u>, 889 F.2d at 1277 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."). Even if counsel's incorrect citation had any relevance as an evidentiary matter, case law is clear that extrinsic evidence "cannot create an ambiguity in an agreement." <u>Kass v. Kass</u>, 91 N.Y.2d 554, 568 (1998) (emphasis omitted).

Mem. at 3-4.  Hirth argues, P. Mem at 3-5, that the contractual language is ambiguous because the meaning of "accidental loss and damage" is not clear and is inconsistent with longstanding New York case law that requires precision in suit limitation language, see Fabozzi, 601 F.3d at 91-93.

It is not appropriate or necessary, however, to decide whether the suit limitation provision would operate to bar all possible suits arising under the policy.  The issue before the Court is not whether the suit limitation provision is unambiguous in every imaginable application, but rather whether it is unambiguous in its application to the particular claim being made by Hirth.

The policy's requirement that suit be brought within two years of "the" occurrence requires us to look at the particular matters listed within the definition of "occurrence" to determine what "occurrence" is being referred to.  The two items listed in the definition of "occurrence" are "accidental loss" and "damage to covered property," which are each explained to some degree in the policy. While it is hardly unambiguous, the limitations provision may reasonably be read to require that a suit over an "accidental loss" be brought within two years of the accidental loss, and that a suit over "damage to covered property" be brought within two years of the damage to covered property.

 Hirth's suit does not seek a payment under the policy for the damage to his apartment caused by the water — that is, damage to the "covered property."  Rather, it seeks only the "Additional Living Expense[s]" promised in the policy.  Policy at 34.  Turning to the limitation language, Hirth's claim is thus not for "damage to covered property" — that is, water damage to the apartment and its contents.  Rather, the claim is for "Additional Living Expense[s]," which the policy explicitly categorizes as damages stemming from a "loss" — specifically, a "Loss of

Use of the Residence Premises." Id.  Accordingly, if the suit has been brought within two years of that "loss," it is unnecessary to consider the larger question of whether the suit limitation language is sufficiently specific to bar a suit that sought to claim damages to the apartment itself or any other category of damages.

While it is not the only possible interpretation, we believe that the policy can reasonably be interpreted to run the limitations period for a suit over a "loss" from the date of the "loss" experienced by the insured.  Hirth's suit seeks only "Additional Living Expense[s]," which the policy contemplates as occurring on an ongoing basis after the insured peril — specifically, "while [the policyholder] lives elsewhere." Id.  The policy does not unambiguously require that the "loss" be considered as accruing incrementally, such as by counting each month's rent as a separate claim under the insurance policy.  Rather, it could reasonably be construed as referring to the entire or ultimate loss to plaintiff resulting from his incurring additional living expenses — a loss that was not completed until July 1, 2014, or February 2, 2015, if the loss were viewed as occurring when AIC denied Hirth's claim.  See Compl. ¶ 13.  Because the instant action was filed on February 24, 2015, it is timely because it was filed within two years of the date of the loss.

This interpretation is bolstered by the decision of the New York Court of Appeals in Executive Plaza, LLC v. Peerless Ins. Co., 22 N.Y.3d 511 (2014).  In that case, the Court of Appeals found that a two-year limitations period in an insurance policy covering replacement of property would not be "reasonable if . . . the property cannot reasonably be replaced within two years." Id. at 518.  Similarly, the coverage for additional living expenses could theoretically extend beyond or close to the two-year limitations period, as was true here.  It would not be reasonable to read the policy's limitations provision to require a party to file suit for such

11

expenses even before they had been incurred or very shortly after they were incurred.[6]

A decision of the Appellate Term applied a similar rationale to claims for additional living expenses under a homeowners insurance policy.  In Villa v. Sterling Ins. Co., 28 Misc. 3d. 90 (App. Term 2d Dep't 2010), an insured homeowner brought claims for unpaid additional living expenses "just over two years after the date of the fire" that destroyed her home.  Id. at 91. Her policy had a limitation clause requiring suit to commence within "2 years after the loss."  Id. The Villa policy stated that the additional living expenses would be "paid on a monthly basis upon submission of reasonable proof of the insured's expenses" and had an "open-ended" coverage for additional living expenses, "specifying that it was not limited by the policy period." Id. (internal quotation marks omitted).  Villa found the policy to be "ambiguous as to the applicable limitations period respecting actions seeking additional living expenses" and ruled that "the statute of limitations on these items did not begin to run until after [the insurer's] breach of contract" — that is, the insurance company's denial of the insured's claim.  Id.

There is an additional basis on which to find ambiguity in the limitations provision. The provision as applied to Additional Living Expenses contains a requirement that suit not be brought "unless the policy provisions have been fully complied with."  Policy at 57.  A "reasonably intelligent person," Olin Corp., 704 F.3d at 99, familiar with insurance policy terminology might well believe that this provision barred him or her from bringing suit until the

---

[6] AIC argues that Executive Plaza and a similar case, The Richard Avedon Found. v. AXA Art Insurance Corp., 2015 N.Y. Misc. LEXIS 585 (Sup. Ct. N.Y. Cnty. Feb. 4, 2015), are not relevant because they stand merely for the proposition that a contractual limitation period will be invalid only when a condition precedent to suit cannot be satisfied before the limitation period expires. D. Repl. Mem. at 6-8.  But the relevance of Executive Plaza here is that it validates the common sense expectation that a two-year limitation provision should not be read to start running from an event that could not even be completed within two years.

loss had actually been sustained — that is, he or she had actually completed the outlay of rental payments.

We reject AIC's argument that the "limitations period is tied to the date the covered property sustained loss and damage," D. Repl. Mem. at 3 (emphasis omitted), for all possible suits regardless of the type of damage or loss claimed. AIC's contention that the phrase "to covered property" applies to both "accidental loss" and "damage," id., does not help their argument. The coverage for additional living expenses cannot reasonably be construed as "loss . . . to covered property" nor as "damage to covered property." Thus the term "loss" must be viewed on its own. The fact that the term "loss" is modified by the term "accidental" does not make the limitations provision unambiguous in barring Hirth's suit. As was noted in a case construing a similar provision, the phrase "[a]ccidental loss or damage,' . . . can reasonably be read to refer to the category of losses or damages that happen by accident — as compared to purposeful or intentional damages — not to the accident itself." No Hero Enters. B.V. v. Loretta Howard Gallery Inc., 20 F. Supp. 3d 421, 426 (S.D.N.Y. 2014); accord Northpointe Commerce Park, LLC v. Cincinnati Ins. Co., 2014 WL 7365931, at *5 (W.D.N.Y. Dec. 24, 2014) (defining "loss" as "accidental loss or damage" did "nothing more than eliminate intentional events and limit coverage to events that occur 'unexpectedly and without design'"). The term "accidental loss" appears only in the definition of "occurrence" in the policy and nowhere else. It is nowhere defined or elucidated. This lack of definition or explanation contributes to the ambiguity of this phrase. See Fabozzi, 601 F.3d at 93 (emphasizing lack of definition of the term "loss" in the policy's limitation provision and finding the provision ambiguous); Villa, 28 Misc. 3d. at 91 (same).

The cases cited by AIC enforcing limitations provisions do not detract from this analysis.

13

Many of them involved suits over damage resulting from the insured event, not any ongoing loss occurring after that event. See Franco Apparel Grp., Inc. v. Nat'l Liab. & Fire Ins. Co., 2011 U.S. Dist. LEXIS 72122 (S.D.N.Y. June 28, 2011) (suit for theft of goods covered by insurance contract), aff'd 481 Fed. App'x 694, 695 (2d Cir. 2012) (summary order); Pfeffer v. Harleysville Grp., Inc., 2011 U.S. Dist. LEXIS 146473, at *25-26 (E.D.N.Y. Sept. 30, 2011) (damage to building resulting from construction), aff'd 502 Fed. App'x 28 (2d Cir. 2012) (summary order). The unpublished decision in McKechnie v. State Farm Fire & Cas. Co., 10 Civ. 6896 (CS) (S.D.N.Y. Dec. 19, 2011) (appended as Exhibit B to Welch Decl.), is unhelpful because the limitations provision it discusses unambiguously barred any action "started two years after the occurrence causing the loss or damage." This straightforward language is absent from the policy here.

IV. CONCLUSION

For the foregoing reasons, the limitations provision relied on by AIC is ambiguous and thus cannot bar Hirth's suit on this motion to dismiss. Accordingly, AIC's motion to dismiss the complaint (Docket # 14) is denied.

SO ORDERED.

Dated: January 7, 2016
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge